**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

JOSHUA LEWIS,                          :
                                       :
  Plaintiff,                           :
                                       :
v.                                     :        CASE NO. 3:22-CV-508 (RAR)
                                       :
CITY OF HARTFORD AND                   :
JASON THODY                            :
                                       :
  Defendants.                          :

**<u>RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Joshua Lewis ("Plaintiff") was employed as a police officer for the City of Hartford from February of 2004 through October 13, 2021. Lewis filed this action against the City of Hartford and Jason Thody, who is the Chief of Police for the City of Hartford. Counts One and Two of the Amended Complaint allege that the Defendants discriminated against Lewis because of his disability and failed to accommodate his disability, in violation of the Americans with Disabilities Act ("ADA") and the Connecticut Fair Employment Practices Act ("CFEPA"). (Dkt. #36, at 5-7.) Count Three alleges intentional infliction of emotional distress and alleges that Chief Thody intentionally reassigned Lewis to a position that would exacerbate his disability. (Id., at 8.) Count Four alleges that the Defendants constructively discharged Lewis on October 13, 2021. (Id., at 9.)

On June 7, 2024, Defendants moved for summary judgment on all four counts. Defendants argue that (a) during the relevant period, Lewis was not disabled within the meaning of the ADA or CFEPA (dkt. #58-1, at 11-22); (b) Defendants were unaware of Lewis' alleged disability (Id, at 23-30); and (c) Lewis' discrimination claims are time-barred because he failed to file his administrative complaint within 300 days of the adverse actions. (Id., at 7-9.)

1

Defendant Thody also argues that Lewis has not produced sufficient facts to establish a claim for intentional infliction of emotional distress. (Id, at 44-51.)

On August 16, 2024, Lewis filed his Memorandum in Opposition to the Motion for Summary Judgment. (Dkt. #69.)  Thereafter, additional briefs were filed on September 20, 2024 (Dkt. #78), October 23, 2024 (dkt. #82), and October 29, 2024 (dkt. #83). The Court scheduled oral argument for January 24, 2025. (Dkt. #87.) On the day of the oral argument, the parties jointly requested a continuance, and permission to re-open discovery on a limited basis. The Court granted the requests. (Dkt. #91-93.)

On April 17, 2025, Defendants filed a Supplemental brief in support of the Motion for Summary Judgment. (Dkt. #95). Lewis responded on May 16, 2025 (dkt. #96), and the Defendants filed a reply on May 24, 2025. (Dkt. #97.)  The Court held oral argument on September 16, 2025. (Dkt. #101-103.)

For the reasons set forth below, Defendants' Motion for Summary Judgement is **GRANTED** as to Counts One, Two, and Three, but **DENIED** as to Count Four.

I.      **FACTS**

At all times relevant, the City of Hartford employed Joshua Lewis as a police officer. (Dkt. #88 at ¶1).  In 2011 or 2012, Lewis was promoted to the position of police detective, which is a special assignment. (Id., at ¶2).

From February 2010 until June 7, 2020, Lewis was a detective assigned to the Special Investigative Division (hereinafter "SID"). (Id., at ¶4).

From 2012 to 2014, Lewis was assigned to the sex offender registry compliance unit in SID which involves ensuring sex offenders are compliant with registration requirements. (Id., at

¶7). During that time, Lewis was not investigating sex crimes against children such as those involving child sexual assault, abuse, sexual exploitation, or child trafficking cases. (Id).

During his time in SID, Lewis later became experienced in investigating physical and sexual abuse crimes against children, and taught recruits and police officers at the police academy. Lewis never requested to be assigned out of SID. (Id., at ¶8).

Between December of 2019 and February of 2020, Lewis was having trouble sleeping at home and experiencing anxiety at work. (Id., at ¶9). However, between those dates, Lewis did not seek medical treatment for his anxiety, and did not speak with a medical professional, a representative of the City of Hartford, the Hartford Police Department ("HPD"), or the Employee Assistance Program. (Id., at ¶10 and ¶16).

Between December of 2019 and March 6, 2020, Lewis asserts that he had multiple conversations with Assistant Chief Rafael Medina, during which Lewis told Assistant Chief Medina that he was having trouble interacting with his family, sleeping, eating, speaking, and communicating. (Dkt. #69-6, at ¶39-43).  Lewis told Assistant Chief Medina that he was frequently feeling dread, hyper-emotional, and having chest pains. (Id.). According to Lewis, Assistant Chief Medina said Lewis was suffering mental health issues due to the amount of time Lewis spent in SID working violent and perverse crimes. (Id.).

At all times relevant, Lewis was aware of Hartford's Employee Assistance Program ("EAP"), a confidential program offered to employees at no charge, where employees can seek confidential counseling for any health or non-health-related concerns or problems. (Dkt. #88, at ¶12). The EAP assists HPD employees in dealing with stress due to job-related adjustment or career burnout issues, interpersonal or attitudinal issues, or traumatic events. (Dkt. #96-1, at ¶29(b)). The EAP also assists HPD employees with alcohol and substance abuse issues, family

problems, gambling, financial, and psychiatric or behavioral problems. (Id.) The EAP policy

provides an absolute guarantee of confidentiality. (Id., at ¶29(c).) Under the policy, no

individual, department, or agency shall have any access to any information regarding individuals

who are referred to or participate in the program and neither the EAP coordinator nor any

member of the staff shall discuss or disclose any fact or aspect of the individual's name unless

specifically requested to do so in writing by the participant. (Id.)

In early 2020, Sergeant John Miller was one of Lewis' direct supervisors in SID. (Dkt.

#88, at ¶17). On February 26, 2020, Lewis told Sgt. Miller that he was stressed out and possibly

suffering from symptoms of PTSD. (Dkt. #96-1, at ¶29(g)). At the time, Lewis did not know that

he had any disability or medical condition.[1] (Dkt. #88, at ¶25). Lewis did not tell Sgt. Miller that

he saw a medical professional, or had anxiety, PTSD, or a mental health impairment. (Id., at

¶26). Lewis did not provide Sgt. Miller with a medical note. (Id.) Lewis also did not tell Sgt.

Miller that he wanted a position that would not exasperate his anxiety and PTSD because Lewis

did not even know he had those conditions at the time.[2] (Id., at ¶27). Lewis requested time off,

which Sgt. Miller granted. (Dkt. #96-1, at ¶29(g)).

At the time of their conversation, Sgt. Miller knew that Lewis was under investigation by

the Internal Affairs Division and had recently left the FBI Task Force due to issues with the FBI

supervisor. (Id., at ¶29(h)). Sgt. Miller referred Lewis to EAP and completed a confidential EAP

Referral Form, so that Lewis could deal with his stress. (Id., at ¶29(j); dkt. #95-4). On the referral

---

[1] Lewis admits that he "was unaware of any formal medical diagnosis" but states that he was aware that he was experiencing severe mental impairments and knew that there was something wrong with him. (Dkt. #88, at ¶25).

[2] At the time, Lewis was assigned to a task force and reporting to the New Haven FBI. Therefore, Sgt. Miller was not assigning Lewis many HPD sex crimes cases. (Dkt. #88, at ¶22).

form, Sgt. Miller wrote that Lewis "explained to me that he was currently stressed out and possibly suffering from symptoms of PTSD. [Lewis] asked for and was granted time off." (Dkt. #95-4.) Sgt. Miller hand-delivered the EAP referral form in a sealed envelope to the mailbox of the EAP Coordinator, who was Officer Theresa Velez. (Dkt. #96-1, at ¶29(l).) As per the HPD's policy, Sgt. Miller kept his conversation with Lewis and the referral to EAP confidential. (Id., at ¶29(c)-(e), (g), and (k)), and dkt. #95-4). Under General Order #8-18, the HPD shall not have access to the records of an employee's participation (or lack thereof) in the EAP, nor shall any member of the staff provide the HPD with information regarding such participation, unless specifically authorized by the employee. (Dkt. #96-1, at ¶29(d).) Lewis did not provide authorization to the Defendants to disclose the EAP referral or that Lewis was currently stressed out. (Id.)

Around the same time, Lewis contacted EAP Coordinator Velez. (Dkt. #69-6, at ¶45). Lewis told Officer Velez that he had impaired behavior that was symptomatic of a disability such as PTSD, and he needed to receive help in the form of mental health treatment. (Id., at ¶45). Lewis asserts that he also told Officer Velez that he was having chest pains, nightmares, trouble sleeping, and difficulty walking into the office and reporting for duty. (Id., at ¶47). Prior to his contact with Officer Velez, Lewis had not been diagnosed with anxiety, PTSD, or any disability or impairment. (Dkt. #88, at ¶14). Lewis' communications with Officer Velez were kept confidential and private and were not disclosed to anyone else in Hartford. (Id., at ¶13). Officer Velez referred Lewis to Dr. Grant-Hall, who is the doctor who conducts fitness for duty exams for Hartford. (Dkt. #69-6, at ¶50-51).

On March 6, 2020, Lewis submitted a voluntary Request for Reassignment Form ("RFR Form"). (Dkt. #88, at ¶30). The RFR Form is not the form that is used to request an

accommodation for a disability. (Id., at ¶52). The RFR Form is for police officers to indicate their interest in a posted vacant position, or to gain experience in another division.  (Id., at ¶52).

On his RFR Form, Lewis wrote that the "ongoing nature of juvenile sexual assault cases, trafficking cases, juvenile physical abuse investigations and child deaths had begun to take an emotional and physical effect, which is affecting [*sic*] my work performance and home life." (Dkt. #69-10**,** at 1). The RFR Form asks the officer to identify which division, unit, or district he or she desires to be reassigned to, and Lewis wrote "C4 or Backgrounds." (Id.) Although the RFR Form allows for attachments to be submitted, Lewis did not attach a medical note. (Dkt. #88, at ¶63). Lewis' RFR Form did not reference any medical treatment, counseling, or participation in EAP. (Id., at ¶64). Lewis also did not indicate that he was seeking an accommodation for an alleged disability. (Id., at ¶65). Lewis also did not state that he was requesting assignment to a "non-violent position." (Id., at ¶66).[3]

From March 6, 2020, through June 8, 2020, Lewis remained in the SID, but while he was awaiting his new assignment, he was doing paperwork to close out his case files and had limited interaction with the public. (Id., at ¶73). In March of 2020, the HPD's resources were strained due to the pandemic. (Id., at ¶73). Thus, even the police officers assigned to Backgrounds Unit, Pistol Permits, and the Civil Litigation Unit needed to work shifts in the Patrol Unit, which potentially exposed those officers to investigations involving violence or death. (Id.).

Lewis' RFR Form was assigned to Lt. O'Shea, Sgt. Arroyo, Captain Miller**,** Assistant Chief Medina, and Chief Thody. (Dkt. #69-6, at ¶65)**.** The RFR Form contains individual endorsement sections for the employee's supervisor, the Division / District Commander, Bureau

---

[3] Sgt. Miller did not see, receive, sign or learn of Lewis' RFR Form until after Sgt. Miller retired from the HPD in May of 2020. (Dkt. #88, at ¶32; dkt. #96-1, at ¶29(y)).

Commander, the Chief of Operations, and the Chief of Police. (Dkt. #69-10). Each endorsement section contains a check box that indicates whether the supervisory officer has "approved" or "disapproved" the employee's request for reassignment. (Id.).

On March 9, 2020, each supervisory officer completed his or her section of Lewis' RFR Form. (Id.). In the supervisor's endorsement section, Sgt. Arroyo checked the box for "approved" and wrote "Det. Lewis will excel where ever (sic) he goes. Great Detective." (Dkt. #69-10, at 1). In the endorsement section for the Division / District Commander, Lt. O'Shea checked "approved" and wrote "approved without reservations." (Id.). In the endorsement section for the Bureau Commander, Captain Miller checked "approved." (Id.). In the endorsement section for the Chief of Operations, Assistant Chief Medina checked "approved." (Id.) Finally, Chief Thody checked "approved" and wrote "Location TBD."[4] (Id.)

On March 11, 2020, Lewis sought medical treatment with a licensed psychologist, Dr. Robin Grant-Hall, upon referral from Officer Velez (EAP). (Dkt. #88, at ¶34). Based on Lewis' symptoms, Dr. Grant-Hall told Lewis that he met seven of the eight symptoms for Post Traumatic Stress Disorder ("PTSD"). (Dkt. #69-6, at ¶68). However, Dr. Grant-Hall did not diagnose Lewis with PTSD or any medical disability. (Dkt. #88, at ¶39). During their meeting, Dr. Grant-Hall suggested that Lewis ask for a transfer out of the sex crimes unit, but she did not suggest that Lewis take a leave of absence or leave all police work. (Id., at ¶41).

From March 11, 2020, to July 28, 2020, while Lewis was still working at the HPD, Dr. Grant-Hall did not diagnose Lewis with any medical disability because she did not have enough

---

[4] Lewis never spoke with or requested to speak with Chief Thody regarding the request for reassignment. (Dkt. #88, at ¶69). The first time Chief Thody became aware that Lewis was voluntarily requesting reassignment from SID was when Chief Thody received the RFR Form through the chain of command. (Id.)

information and had not treated Lewis long enough to be able to make a medical determination and diagnosis. (Id., at ¶40). During that period, Dr. Grant-Hall did not provide Lewis with a medical note diagnosing him with any disability or with any medical restrictions at work. (Id., at ¶42). Lewis never asked Dr. Grant-Hall to provide him with a medical note to submit to Hartford or the HPD. (Id., at ¶43).

Under the HPD's Code of Conduct, a police officer is obligated to notify the Chief of Police or the Human Resources Department of any physical, mental or other limitations concerning his or her fitness for duty. (Id., at ¶45). Once an officer provides such notice, the officer is directed to Richard Pokorski, who is Hartford's Benefits Administrator for FMLA requests. (Id., at ¶44 and ¶45). Mr. Pokorski then engages with the employee and the employee's medical provider to determine the employee's work capacity, what accommodation(s) the employee is requesting and what the Department can offer by way of an accommodation. (Id.) Hartford does not determine if the employee has a medical condition or disability or what the employee needs. (Id., at ¶54). Instead, Hartford relies upon the medical provider for information concerning what the employee needs to be able to work. (Id.).

At some point after March 16, 2020, possibly on March 19, 2020, Lewis met with Assistant Chief Medina regarding the symptoms he was experiencing. (Dkt. #69-6, at ¶70). Lewis claims that he told Assistant Chief Medina that he went to EAP, was seeing a therapist, and needed a break from the types of crimes he was involved in at SID. (Id., at ¶72-73). Lewis did not ask Assistant Chief Medina to keep the information about the therapist confidential. (Id.). According to Lewis, Assistant Chief Medina said he would try to talk to Chief Thody and get Lewis assigned to an administrative position based on their discussion of the symptoms Lewis had been experiencing due to the nature of his work at SID. (Dkt. #69-6, at ¶75).

At some point between March 9, 2020, and June 8, 2020, Assistant Chief Medina spoke to Chief Thody about Lewis' request for reassignment. (Dkt. #69-12, at 10). Assistant Chief Medina told Chief Thody that Lewis had been in SID for ten years, was burning out, and it was time to make a move because it was taking a toll on Lewis and his personal life. (Id. at 10-11.) Assistant Chief Medina recommended moving Lewis to Asset Forfeiture or another background position and said that he and Captain Rousseau would figure out how to move Lewis there. (Id. at 10.) In response, Chief Thody said no, "the tail doesn't wag the dog, the dog wags the tail." (Id., at 11.)

In June of 2020, Assistant Chief Medina told Chief Thody that Lewis was looking for permission to be transferred from SID, not that Lewis wanted an accommodation for a disability. (Dkt. #88, at ¶48). HPD officers are aware that they are not entitled, by contract, to any assignment, and that assignments are at the discretion of the Chief of Police. (Id., at ¶55).  As part of their employment, HPD officers agree that the Chief of Police is entitled to exercise managerial discretion when determining where an officer will be assigned. (Id., at ¶56). If, as determined by the Chief of Police, there is a vacant position, the Personnel Division posts a notice of the vacancy to all sworn police personnel. (Id., at ¶57). From February 2020 to July 28, 2020, there were no vacancy postings for detective positions. (Id., at ¶58).

To the extent that Lewis' RFR Form expressed a desire to be assigned to C4 Intelligence or the Backgrounds Unit, there were no vacancies in those units, given the needs of the Department, from June 4, 2020, through July 28, 2020. (Id., at ¶92).

In or about June of 2020, Chief Thody determined, in consultation with the Commander of the Detective Division, that the HPD needed a detective in Crime Scene Division ("CSD"). (Id., at ¶82). Thus, Chief Thody granted Lewis' reassignment request from SID to CSD. (Id.) In

making this decision, Chief Thody determined that the position in CSD would serve Department needs and would also be an assignment where Lewis would not be investigating child sex crimes. (Id.) Chief Thody had discretion to assign officers to divisions that needed personnel and the CSD was the shortest staffed division and had the highest need. (Id., at ¶83).

Lewis was notified of his re-assignment to CSD on June 8, 2020. (Id., at ¶4 and ¶93). At that time, Lewis knew that the position in CSD investigated violent crimes, and he was concerned about how it would affect his condition, but he could not predict that it would exacerbate his PTSD. (Dkt. #69-6, at ¶84). Lewis never asked a medical professional for a note stating that he should not be assigned to the CSD. (Dkt. #88, at ¶87). From June 8, 2020, through July 28, 2020, Lewis did not request to be reassigned out of the CSD or request any accommodation at all. (Id., at ¶96 and ¶97; Dkt. #69-6, at ¶84).

After being transferred to the CSD, Lewis did not handle any child sexual assault cases, child abuse cases or trafficking cases. (Dkt. #88, at ¶94). Lewis remained in the CSD until his last day of work, which was July 28, 2020. (Id., at ¶93). From June 8, 2020, through July 28, 2020, Lewis did not visit any medical professionals for mental health concerns. (Id., at ¶86). During that timeframe, no medical professionals told Lewis that he could not work in CSD, and Lewis did not provide Hartford with any medical documents from anyone indicating that he had a disability or medical restrictions. (Id., at ¶102, ¶104 and ¶115.) Between June 8, 2020, and July 28, 2020, Lewis did not submit any requests for reassignment from CSD or request any accommodations. (Id., at ¶102)

On June 25, 2020, Lewis investigated a fatal motorcycle accident. (Dkt. #69-6, at ¶86). Lewis was emotionally affected when he had to notify the family of the death. (Id., at ¶86).

10

Thereafter, between July 6 and July 18, 2020, Lewis investigated three more death related incidents. (Id., at ¶88-94).

On July 28, 2020, after feeling overheated, Lewis went to the hospital with an elevated heart rate. (Id., at ¶95.) Lewis initially believed he was having an oncoming heart attack. (Id., at ¶95.) Lewis told Assistant Chief Medina that he thought he had a heart attack. (Dkt. #88, at ¶99.) Lewis' workers' compensation claim was noted as being for a sudden elevated, rapid heart rate. (Id., at ¶100.) On or about July 28, 2020, the hospital discharged Lewis and did not diagnose him with PTSD, anxiety, or any mental health impairment. (Id., at ¶101.)

To accommodate temporary or partial compensable disabilities for officers who sustain work-related illnesses, injuries or medical conditions, the HPD requires an employee to provide the chief of police or his designated representative with a doctor's note with work restrictions. (Id., at ¶108.) As of September of 2020, Lewis had been out of work since July 28, 2020, with no medical note to support an approved absence from work. (Id., at ¶106.) In September or October 2020, Deputy Chief Rendock checked with Hartford's personnel division and Hartford's worker's compensation carrier, to determine Lewis' work status, and to determine on what basis Lewis' absence from work had been approved. (Id., at ¶105.)

On October 8, 2020, the workers' compensation carrier sent a letter to Lewis denying his compensation claim because he had not provided any medical releases or reports to support his claim that rapid heartbeat was a work-related injury. (Id., at ¶107.) Thereafter, on October 22, 2020, Lewis retained the law firm of Patrick Tomasciewicz to represent him in the workers' compensation claim. (Id., at ¶109.) On that date, Lewis provided his first notice to the carrier that he was claiming PTSD in the context of his workers' compensation claim. (Id., at ¶110.)

Thereafter, by certified letter dated December 8, 2020, Deputy Chief Rendock advised Lewis that because Lewis had been absent from work since July 28, 2020, and his worker's compensation claim had been denied, Lewis should comply with the applicable policies related to sick leave, FMLA, and / or ADA absence. (Id., at ¶111**.**)  Deputy Chief Rendock's letter further advised Lewis that he might be entitled to extended leave under the FMLA, and if he wanted to take such a leave, his medical provider should complete a medical certification, which was enclosed, and return it by December 28, 2020. (Dkt. #58-15.)

On December 15, 2020, Lewis saw Dr. Grant-Hall, who confirmed that Lewis had PTSD and concluded that Lewis' transfer to CSD provided even more frontline exposure than SID did. (Dkt. #69-6, ¶112-¶114.) Dr. Grant-Hall opined that Lewis was totally disabled retroactive to July 28, 2020. (Dkt. #88, at ¶117). Prior to December 15, 2020, Lewis had not raised any mental health concerns with any of his primary care physicians. (Id., at ¶118**.**) Lewis has not returned to work at Hartford since July 28, 2020. (Id., at ¶120**.**)

On April 28, 2021, Lewis filed a discrimination complaint with the CHRO. (Id., at ¶120**.**)

On October 13, 2021, while represented by counsel, Lewis voluntarily submitted his letter of resignation to Chief Thody, and Chief Thody accepted it. (Id., at ¶123**.**) On December 17, 2021, Hartford's Pension Commission approved Lewis' application for a disability pension, thereby converting his resignation to a disability retirement. (Id., at ¶124.)

## II.    LEGAL STANDARD

### A.  Standard for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is material only

where the determination of the fact "might affect the outcome of the lawsuit." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).[5]

The movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

If the movant satisfies the burden of showing no genuine dispute of material fact, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." <u>Robinson v. Concentra Health Servs., Inc.</u>, 781 F.3d 42, 44 (2d Cir. 2015). "The party opposing summary judgment must do more than vaguely assert the existence of some unspecified disputed material facts or rely on conclusory allegations or unsubstantiated speculation." <u>Gary v. Nordstrom</u>, 3:18cv1402 (KAD), 2020 WL 5709632, at *1 (D. Conn. Sept. 24, 2020).

When resolving a motion for summary judgment, a court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [that party's] favor." <u>Gary Friedrich Enters., LLC v. Marvel Characters, Inc.</u>, 716 F.3d 302, 312 (2d Cir. 2013). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party,

---

[5] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 82-83 (2d Cir. 2004). The Court cannot "make credibility determinations or weigh the evidence," when considering a motion for summary judgment, as these are functions for a jury. Proctor v. LeClaire, 846 F.3d 597, 608 (2d Cir. 2017).

### B. Disability Discrimination (Counts One and Two)

"The ADA prohibits 'discriminat[ion] against a qualified individual on the basis of disability.'" McBride v. BIC Consumer Products Mfg. Co., Inc., 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(a)). Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[.]" 42 U.S.C. § 12112(b)(5)(A). Similarly, the CFEPA prohibits discrimination based on an employee's disability, "except in the case of a *bona fide* occupational qualification or need," Beason v. United Techs. Corp., 337 F.3d 271, 276–77 (2d Cir. 2003)(citing Conn. Gen. Stat. § 46a–60(a)(1)), and requires an employer to reasonably accommodate an employee's disability. S*ee* Eldridge v. Hosp. of Cent. Conn., 230 Conn. App. 666, 675 (2025). "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." Jackan v. New York State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000).

Connecticut courts generally analyze ADA and CFEPA claims under the same standard. Russell v. Drivers Mgmt., LLC, No. 19-cv-682 (JCH), 2020 WL 7419664, at *4 n.2 (D. Conn. Feb. 11, 2020). Disability discrimination claims are subject to the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013). At step one, the plaintiff must establish a *prima facie* case of disability discrimination. If the plaintiff establishes a *prima facie* case, the burden shifts

14

to the defendant to proffer a non-discriminatory reason for the adverse action. St. Mary's Honor

Center v. Hicks, 509 U.S. 502, 509 (1993). If the defendant articulates a legitimate, non-

discriminatory reason for the adverse action, the presumption of discrimination is rebutted, and

the burden shifts back to the plaintiff to demonstrate that the defendant's proffered explanation

for the adverse action is pretextual. Id. at 516-19.

> [A]n employee bringing a reasonable accommodation claim must show that: (1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, the employee could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

Persechino v. United Servs., Inc., No. 22-2762, 2024 WL 1253633, at *2 (2d Cir. Mar. 25,

2024).

The parties agree that Hartford is covered by the ADA and CFEPA. However,

Defendants dispute that Lewis suffered from a disability during the relevant period, or that the

Defendants had notice of Lewis' alleged disability. Defendants note that Lewis was not

diagnosed with PTSD until October of 2020, which was well after Chief Thody processed

Lewis' RFR Form (March 9, 2020) and transferred Lewis from SID to CSD (June 8, 2020). (Dkt.

#95, at 7-8.) Defendants argue that since Lewis and Dr. Grant-Hall did not know that Lewis had

PTSD on March 9, 2020, or June 8, 2020, Chief Thody could not have known that Lewis had

PTSD or anxiety on those dates either. (Id., at 7 and 9.)

The Defendants concede that, prior to March 9, 2020, Lewis told Sgt. Miller that he was

stressed out and possibly suffering from symptoms of PTSD. However, the Defendants argue

that these comments were insufficient to put Sgt. Miller on notice that Lewis had PTSD, or any

15

disability.[6] (Dkt. #95, at 4-5.) The defendants assert that Sgt. Miller believed that the stress

Lewis was experiencing stemmed from Lewis' IA investigation and his recent departure from the

FBI Task Force, due to an issue with the FBI supervisor.  However, what Sgt. Miller knew or

believed is clearly a question of fact.

Assuming *arguendo* that Lewis' comments should have put Sgt. Miller on notice of

Lewis' disability, the Defendants note that the only request Lewis made of Sgt. Miller was for

time off, and Sgt. Miller granted his request. (Dkt. #95, at 6; dkt. #96-1, at 29(m)). Finally, the

Defendants note that it is undisputed that Sgt. Miller referred Lewis to EAP and kept his

conversation with Lewis and the referral to EAP completely confidential, as per Hartford's

policies. (Dkt. #95, at 2-3 and 6-8.) Therefore, Defendants argue that Chief Thody (the actual

decision-maker) could not have had actual or constructive notice of Lewis' disability. (Id.) S*ee*

Perrotti v. A Duie Pyle, Inc., 3:14-cv-285 (AWT), 2015 WL 11237027, at *8 (D. Conn. Sept. 21,

2015)(granting summary judgment where there was no evidence that the decision-makers had

knowledge of the disability).

In response, Lewis argues that while there was no formal diagnosis of PTSD on the date

that his request for reassignment was denied, it should have been obvious to the Defendants that

he had a disability and was requesting an accommodation. (Dkt. #96.). Lewis argues that his

comments to Sgt. Miller should have put Sgt. Miller on notice of the disability, and the

Defendants should not be allowed to hide behind the confidentiality of the EAP, especially

because it was Sgt. Miler, not Lewis, who chose to utilize the EAP. (Id., at 1-2.) Lewis notes

---

[6] Defendants cite cases holding that an employer's mere knowledge of an employee's symptoms does not establish, as a matter of law, that the employer knew that the employee was disabled. *See* Cozzi v. Great Neck Union Free School Dist., 2009 WL 2602462 at *14 (E.D.N.Y. Aug. 21, 2009). The defendants also argue that Lewis' failure to provide a medical note or document, and his failure to contact the Benefits Administrator, despite knowing that Hartford's policies required him to take such steps, should weigh against a finding that the Defendants had notice of his alleged disability. (Dkt. #95, at 9.)

that, upon learning that his subordinate was complaining of PTSD symptoms, Sgt. Miller chose to go to EAP, rather than notify his chain of command. (Id.) Lewis argues that, under normal circumstances, Hartford's duty to engage in an interactive dialogue would have been triggered once Sgt. Miller had notice of Lewis' disability.[7] (Id.) However, by relying on the confidential EAP process, Sgt. Miller prevented the information about Lewis' disability from reaching the ultimate decision-maker. (Id., at 2-3.) Lewis argues that "[t]his set up now allows the City to act as if it had no notice of Mr. Lewis' condition despite the fact that it is undisputed [Lewis] reported to his supervisor that he believed he may be suffering from PTSD." (Id., at 3.) Lewis argues that his comments to Assistant Chief Medina were also sufficient to put the Defendants on notice of his disability.

The undersigned need not resolve the issue of whether the Defendants had actual or constructive notice of Lewis' disability in March or June of 2020 because, as discussed below, Counts One and Two are time barred.

### C. Statute of limitations

"Ordinarily, a plaintiff seeking to bring a claim pursuant to the Americans with Disabilities Act ("ADA"), Title VII, or the Connecticut Fair Employment Practices Act ("CFEPA") must exhaust administrative remedies through the EEOC or CHRO." Soules v. Connecticut, Dep't of Emergency Servs. & Pub. Prot., 882 F.3d 52, 57 (2d Cir. 2018). In states such as Connecticut, where there is an agency with the authority to address charges of discriminatory employment practices, the statute of limitations for filing a charge of disability

---

[7] "[A]n employer has a duty reasonably to accommodate an employee's disability if the disability is obvious — which is to say, if the employer knew or reasonably should have known that the employee was disabled." Brady v. Wal-Mart Stores, Inc., 531 F.3d. 127 135 (2d Cir. 2008).

17

discrimination with the federal EEOC is 300 days after the alleged adverse action. See 42 U.S.C. § 2000e–5(e)(1); 42 U.S.C. § 12117(a); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). Thus, if a plaintiff fails to file a timely charge with the EEOC, the claim is time-barred. Morgan, 536 U.S. at 109.

Lewis did not file his administrative complaint within 300 days of June 8, 2020, which is the date that Lewis' request for an accommodation was allegedly denied, and the date that Lewis was transferred to the CSD. However, Lewis argues that his claims should be considered timely. The Court will address each of Lewis' arguments below.

1. Lewis Argues that the Continuing Violation Doctrine Applies.

First, Lewis attempts to rely on the continuing violation doctrine.

> Prior to 2002, the continuing violation-doctrine permitted recovery for discriminatory conduct that occurred outside of the applicable limitations period if the conduct was part of a "practice or policy" of discrimination. *See, e.g., Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir.2001). However, the scope of the continuing violation doctrine was substantially restricted by the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

Nakis v. Potter, 422 F. Supp. 2d 398, 409 (S.D.N.Y. 2006).

In Morgan, the United States Supreme Court addressed two critical questions: "[w]hat constitutes an 'unlawful employment practice' and when has that practice occurred'?" Morgan, 536 U.S. at 110. In answering these questions, the Court distinguished between discrete acts and continuing violations. The Court observed that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." Id., at 114. "A discrete. . . discriminatory act "occur[s]" on the day that it 'happened.' A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it." Id., at 110. The Supreme Court made clear that

18

> discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred.

Id., at 113.

In contrast, the Supreme Court noted that "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id., at 115.

"As a general matter, the continuing violation doctrine "is heavily disfavored in the Second Circuit" and courts have been "loath" to apply it absent "compelling circumstances." Trinidad v. New York City Dep't of Correction, 423 F. Supp. 2d 151, 165 (S.D.N.Y. 2006)(quoting Stephens v. Hofstra University School of Law, 2005 WL 1505601, at *4 (E.D.N.Y. Jun. 24, 2005)).

Here, although Lewis requested to be transferred to C4 Intelligence or the Backgrounds Division, his request was denied on June 8, 2020, when he was transferred to the CSD. (Dkt. #69-6, at ¶81.) Whether Lewis characterizes this event as a denial of an accommodation or a discriminatory transfer, the event was a discrete discriminatory act which triggered the statute of limitations. See Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134–35 (2d Cir. 2003)(the denial of an employee's proposed accommodation is a discrete act); Barrett-Browning v. Dep't of Correction, No. 3:18-CV-01732 (JAM), 2020 WL 5118132, at *5 (D. Conn. Aug. 31, 2020)("[A] claim for a failure to accommodate a disability is not inherently continuous in nature for purposes of applying a statute of limitations."); Ross v. New York, 15-CV-3286 (JPO), 2017 WL

19

354178 at *2 (S.D.N.Y. 2017)(a claim for failure to accommodate a disability is not subject to continuing violation doctrine to extend the statute of limitations); Clark v. Stop & Shop Supermarket Co., No. 3:15-CV-00304 (JCH), 2016 WL 4408983, at *6 (D. Conn. Aug. 16, 2016)("an employer's rejection of an employee's request for a reasonable accommodation starts the statute of limitations."); Sepulveda v. Stop & Shop Supermarket Co LLC, No. 3:14-CV-00191-WWE, 2016 WL 3248168, at *1 (D. Conn. June 10, 2016)("[A]n employer's rejection of an employee's proposed accommodation is the sort of discrete act that does not give rise to a continuing violation."); Delrio v. Univ. of Connecticut Health Care, 292 F. Supp. 2d 412, 420 (D. Conn. 2003)("[I]t is well settled law in the Second Circuit that "discrete acts" include discriminatory transfers. . . ."). Thus, Lewis was required to file a charge within either 180 or 300 days of June 8, 2020. It is undisputed that he did not do so.

Lewis asserts that after he was transferred to the CSD on June 8, 2020, he was assigned to investigate violent crimes on multiple occasions. Lewis argues that each such assignment to investigate a violent crime was a new act of discrimination. (Dkt. #69, at 22.) Since the last assignment to investigate a violent crime occurred within 300 days of the filing of Lewis' EEOC complaint, he argues that the continuing violation doctrine applies. However, as the defendants note, Lewis' argument is contrary to the Second Circuit's holding in Elmenayer, 318 F.3d 130 (2d Cir. 2003). (Dkt. #78, at 12-14.)

In Elmenayer, the Second Circuit held that an employer's rejection of a proposed accommodation is a single completed action when taken and "is the sort of 'discrete act' that must be the subject of a complaint to the EEOC within 300 days. Once the employer has rejected the proposed accommodation, no periodic implementation of that decision occurs. . . . " Id. at 135. The Second Circuit further explained that

20

> Although the *effect* of the employer's rejection continues to be felt by the employee for as long as he remains employed, that continued effect is similar to the continued effect of being denied a promotion or denied a transfer, denials that Morgan offered as examples of a discrete act.

Id.

Under Elemenayer, after Lewis was transferred to the CSD, each subsequent assignment he received to investigate a violent crime did not constitute a separate act in furtherance of a continuing violation. Instead, the evidence makes clear that each such assignment was merely an effect of the Defendants' decision to deny the requested accommodation and transfer Lewis to the CSD on June 8, 2020. As Lewis states in his affidavit, on the date that he was transferred to the CSD, he knew that officers in the CSD were required to investigate violent crimes. (Dkt. #69-6, at ¶83.) As Lewis acknowledges in his brief, "the primary duties and responsibilities of an officer in CSD include responding to and investigating horrific violent crimes, both on the street and otherwise." (Dkt. #69, at 14).

Relying upon Fitzgerald v. Henderson, 251 F.3d 345 (2d Cir. 2001), Lewis argues that the Defendants have maintained a discriminatory practice or policy.[8] More specifically, Lewis argues that the defendants have maintained a "practice of forcing individuals such as [Lewis] afflicted with PTSD to investigate violent crimes." (Dkt. #69, at 22.) In support of the alleged discriminatory practice or policy, Lewis asserts that he was assigned to investigate violent crimes when he was in the SID and then continued to investigate violent crimes after being transferred to the CSD on June 8, 2020. Lewis argues that when the Defendants failed to transfer him out of the SID, Lewis had to perform the normal duties of an officer in the SID, which included

---

[8] In Fitzgerald, the plaintiff alleged that her supervisor subjected her to continuous hostile behavior after she rejected his sexual advances. Id. at 362. The Second Circuit found that Fitzgerald could establish a continuing violation or practice.

investigating violent crimes. Thereafter, when the Defendants discriminatorily transferred Lewis to the CSD on June 8, 2020, Lewis had to perform the normal duties of an officer in the CSD, which included investigating violent crimes.

As noted earlier, the failure to transfer Lewis out of the SID in March of 2020, and the discriminatory decision to transfer Lewis to the CSD on June 8, 2020, are time-barred discrete acts. Lewis' continuing practice or policy argument focuses on the effects of those time-barred discrete acts. However, a continuing practice or policy takes into consideration the last act in furtherance of the discriminatory policy, not the effects of the last act. As the Second Circuit explained in Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20 (2d Cir. 1985), when an employee alleges that he or she was subjected to an adverse action

> pursuant to a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it, provided such a continuing violation is clearly asserted both in the EEOC filing and in the complaint. However, a continuing violation may not be based on an employee's having suffered from the effects of an earlier discriminatory act.

Id. at 25 (emphasis added); See also Doe v. Blake, Civ. No. H-90-866(PCD), 809 F. Supp. 1020, 1025 (D. Conn. 1992)("'[a] continuing violation is occasioned by continuing unlawful acts, not by continued ill effects from the original violation.'")(quoting Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981)). Thus, Lewis' continuing practice or policy argument is inconsistent with the case law in the Second Circuit.

Finally, Lewis argues that the Defendants "engaged in a continuing course of conduct because their inaction in failing to transfer [Lewis], or otherwise excuse him from being involved in the investigation of violent crimes, was continuous for such a period of time to amount to a policy or practice." (Dkt. #69, at 25-26). As noted earlier, the failure to transfer or accommodate Lewis on June 8, 2020, was a discrete act which triggered the statute of limitations and does not

give rise to a continuing violation.[9] Sepulveda, 2016 WL 3248168, at *1. It is undisputed that, after Lewis was transferred to the CSD on June 8, 2020, Lewis never asked to be excused from investigating violent crimes or transferred out of the CSD, or for any other accommodation.[10] (Dkt. #88, at ¶96 and ¶97.)  Defendants' failure to transfer Lewis out of the CSD or excuse him from investigating violent crimes at the CSD, in the absence of any such request by Lewis after June 8, 2020, does not establish a continuing violation or policy. Troeger v. Ellenville Cent. Sch. Dist., 523 F. App'x 848, 851 (2d Cir. 2013)(an employee who was denied an accommodation for his disability "cannot file an untimely claim simply by alleging that the [defendant's] noncompliance 'continued,' or that the [defendant] engaged in similar unlawful actions during subsequent years."); Zacharowicz v. Nassau Health Care Corp., 177 F. App'x 152, 154 (2d Cir. 2006)("[A]ny claim [plaintiff] had for the hospital's failure to accommodate his religious practice prior to August 19, 2000 is time-barred. [Plaintiff] has not alleged any unheeded requests for religious accommodation that occurred after this date.").

For the reasons above, the Court finds that Lewis has failed to raise a genuine issue of material fact in support of a continuing violation or policy.[11]

---

[9] As in Elemenayer, no periodic implementation of the decision occurred after June 8, 2020.

[10] Although Lewis' RFR Form expressed a desire to be transferred to the Backgrounds Unit or C4 Unit, the Form specifically stated that Lewis wanted to stop investigating juvenile sexual assault cases, trafficking cases, juvenile physical abuse investigations and child deaths. (Dkt. #69-10). It is undisputed that Lewis did not investigate such cases again, after Chief Thody transferred him to the CSD on June 8, 2020. (Dkt. #88, at ¶82).

[11] Lewis also argues that the Defendants have a policy of retaliating against officers like Lewis who seek reasonable accommodations for their disabilities. (Dkt. #69, at 24.) However, Lewis failed to make such an assertion in his CHRO, EEOC, or federal complaints. See Miller, 755 F.2d at 25 (continuing violation must be clearly asserted in EEOC complaint and federal complaint). Lewis' federal complaint and administrative complaints do not allege retaliation against Lewis or anyone else, or a continuing policy of retaliation. Lewis also argues that other police departments commonly move officers out of sex crimes units within three to five years, or mandate periodic mental health evaluations, and that the Defendants have continuously failed to maintain such a policy or practice. (Dkt. #69, at 20.) No such allegation was made in any of Lewis' complaints. See Miller, 755 F.2d at 25.

2.    Lewis Argues that his Limitations Period should be Equitably tolled.

Lewis argues that his statute of limitations should be equitably tolled. "[E]quitable tolling pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently, but some extraordinary circumstance prevents him from bringing a timely action." Lozano v. Montoya Alvarez, 572 U.S. 1, 10 (2014). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005). A court is not permitted to grant a request for equitable tolling unless the movant demonstrates both elements. Doe v. United States, 76 F.4th 64, 71 (2d Cir. 2023) ("[t]he law prohibits a judge from exercising her discretion where these two elements are missing.")

As for the first element, the litigant must "show diligent pursuit of his claim throughout the period he seeks to toll.... If such a showing is not made, equitable tolling should be denied or at least circumscribed to the period for which diligence and causation are established." Harper v. Ercole, 648 F.3d 132, 139 (2d Cir. 2011). In this respect, courts should examine the party's "diligence not only during the time he seeks to have equitably tolled but also during the time up to and including the date of filing." Adkins v. Warden, 585 F. Supp. 2d 286, 300 (D. Conn. 2008). The standard does not call for "maximum feasible diligence," but rather a showing that the litigant acted "as diligently as reasonably could have been expected under the circumstances[.]" Harper, 648 F.3d at 138–39.

To be eligible for equitable tolling, the second element requires a litigant to demonstrate "extraordinary circumstances beyond his control" that prevented him from filing the administrative complaint. Baldayaque v. United States, 338 F.3d 145, 151 (2d Cir. 2003). The

24

term 'extraordinary' refers to the severity of the obstacle impeding compliance with a limitations period. Bolarinwa v. Williams, 593 F.3d 226, 231-32 (2d Cir. 2010). The Second Circuit has held that medical conditions can serve as extraordinary circumstances, depending on the facts presented. Id.

> [H]owever, even if a [party] demonstrates an "extraordinary circumstance" stood in his or her way of timely filing, he must also demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the [party], acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances.

Jenkins v. Green, 630 F.3d 298, 303 (2d Cir. 2010).

> As the Second Circuit has observed, the requisite causal relationship may be "lacking where the identified extraordinary circumstances arose and concluded early within the limitations period" because, in such a case, "a diligent petitioner would likely have no need for equity to intervene to file within the time remaining to him."

Fraser v. Howard, 21-CV-9904 (JMF), 2022 WL 17718410 at *1 (S.D.N.Y. Dec. 15, 2022)(quoting Harper v. Ercole, 648 F.3d 132, 139 (2d Cir. July 26, 2011)).

   *a. Extraordinary circumstances.*

Lewis essentially asserts that his PTSD was an extraordinary circumstance until December 10, 2020, but after December 10, 2020, the pandemic was the extraordinary circumstance because it caused the CHRO to close, thereby preventing Lewis from filing his administrative complaint.

   **i.  March 6, 2020, through July 28, 2020.**

Between March 6, 2020, and July 28, 2020, Lewis was employed by the HPD, and had not been diagnosed with any disability. (Dkt. #88, at ¶40.) In his affidavit, Lewis asserts that between March 6, 2020, and July 28, 2020, his "PTSD symptoms including anxiety and depression impacted [his] state of mind and rendered [him] unable to seek out information

25

relating to FMLA and ADA accommodation." (Dkt. #69-6, at ¶119.) Aside from this conclusory statement, Lewis does not provide any particularized description of how his PTSD affected his capacity to function in relation to his pursuit of rights during the relevant period. Thus, his conclusory statement is insufficient. See Bolarinwa, 593 F.3d at 232 (2d Cir. 2010)(a party who claims that his medical condition is an extraordinary circumstance must "offer a particularized description of how [his] condition adversely affected [his] capacity to function generally or in relationship to the pursuit of [his] rights."). Additionally, Lewis' brief asserts that he did, in fact, exercise his rights under the ADA during the relevant period, by requesting an accommodation for his disability. (Dkt. #69, at 11)("Mr. Lewis sought accommodation for his disability and symptoms by filing a voluntary request for reassignment on March 6, 2020.")

### ii.    July 28, 2020, through December 10, 2020.

Lewis asserts that due to his crippling symptoms of PTSD, he did not discuss filing a civil lawsuit to pursue his rights under the ADA until December 10, 2020. (Dkt. #69-6, at ¶120.) Lewis asserts that, between July of 2020 and December 10, 2020, his crippling PTSD "caused him to have difficulties with communication to the point where even speaking could cause him to burst into tears and left him in a mental state where he was unable to pursue his rights under the ADA." (Dkt. #69-1, at 30.)  Thus, he asserts that, because of his PTSD, it was not "until December 10, 2020, where [Lewis] first discussed with counsel the possibility of bringing a civil lawsuit."  (Id.)

However, as Defendants note, despite his PTSD, Lewis was able to discuss his workers' compensation case with a lawyer and exercise his worker's compensation rights prior to December 10, 2020. (Dkt. #78, at 15.)  More specifically, on October 22, 2020, Lewis retained counsel to represent him in the ongoing workers' compensation case (dkt. #88, at ¶109), and

26

notified the workers' compensation carrier that he was claiming PTSD. (Dkt. #69-6, at ¶110.)

Thus, during the same period that Lewis asserts that his crippling PTSD symptoms prevented

him from speaking to a lawyer about his discrimination case, it is undisputed that Lewis was able

to speak to and retain a lawyer for his workers' compensation case.[12] Lewis never attempts to

explain this inconsistency. *See* Taylor v. Fresh Direct, No. 12 CIV. 2084 GBD AJP, 2012 WL

6184033, at *2 (S.D.N.Y. Dec. 12, 2012), report and recommendation adopted, No. 12 CIV.

2084 GBD AJP, 2013 WL 1897778 (S.D.N.Y. May 7, 2013)(since correspondence between

Taylor and various attorneys indicates that he was able to pursue his rights during the period he

sought to toll, the court found that the "documents belie[d] any claim that Taylor was prevented

from pursuing his rights due to depression.").

### iii.    December 10, 2020, through April 28, 2021

On December 10, 2020, Lewis' worker's compensation lawyer informed Lewis that he

needed to file an initial discrimination claim with the CHRO. (Dkt. #69-6, at ¶121.) Lewis

asserts that in early January of 2021, he made several calls to the CHRO to initiate the filing

process, but no one at the CHRO answered the phone. (Dkt. #69-6, at ¶122-23.) Thus, Lewis

visited the Hartford CHRO on January 4, 2021, but it was closed, and Lewis could not enter the

building due to the pandemic. (Dkt. #69-6, at ¶124-25.) After he was unable to file the CHRO

complaint himself, Lewis asserts that, on January 20, 2021, he contacted the lawyer who had

been representing him in his workers' compensation case and requested assistance in filing the

CHRO complaint. (Dkt. #69-6, at ¶124-25.)

---

[12] As Defendants note, the law firm that Lewis retained in January of 2021 to handle his disability discrimination case is the same law firm that represented Lewis in his worker's compensation case from October of 2020, through April of 2021. (Dkt. #78, at 15.)

During oral argument on September 16, 2025, Lewis' counsel could not identify the specific dates on which the CHRO was supposedly closed for business due to the pandemic. However, Lewis' counsel noted that the undersigned can take judicial notice of (1) the fact that the CHRO was closed due to the pandemic, and (2) the specific dates on which the CHRO was closed. After extensive research, it appears that the CHRO stopped holding in-person meetings as of March 13, 2020, but continued to conduct business without interruption during the pandemic. A public report issued by the CHRO states that "[o]n March 13, 2020, all in person meetings and hearings with the CHRO and the Office of Public Hearings were cancelled, and operations became electronic and telephonic. . . ." *See*, CT COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES, IMPROVEMENTS/ACHIEVEMENTS 2019-2020 at 4, https://portal.ct.gov/das/-/media/das/communications/communications-list-docs/digest/digest-2019-2020/commission-on-human-rights-and-opportunities.pdf .

The Report states that, in accordance with Governor Lamont's Executive Orders, the CHRO issued orders waving any requirements for in-person meetings, hearings, or screenings, and allowed such proceedings to take place by other methods that would allow the interested parties to participate. Id

Another public Report issued by the CHRO states that

[o]n March 13, 2020, CHRO issued comprehensive guidelines for employees regarding teleworking and expectations for responding to the public during the pandemic. We were able to maintain all operations without a break in service, converting virtual / electronic service via our website, www.portalct.gov/chro. These guidelines remained in place for the duration of the 2020-21 fiscal year.

*See*, CT COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES, IMPROVEMENTS/ACHIEVEMENTS 2020-2021 at 3, https://portal.ct.gov/das/-/media/das/communications/communications-list-docs/digest/digest-2020-2021/commission-on-human-rights-and-opportunities.pdf (Emphasis added).

Thus, although the CHRO stopped conducting business in person in March of 2020, it appears that the CHRO continued to conduct business throughout the pandemic and individuals were able to file complaints with the CHRO electronically.

Additionally, although Governor Lamont issued executive orders which tolled certain filing deadlines due to the pandemic, Governor Lamont's executive orders only applied to judicial proceedings, not CHRO proceedings. *See* Williams v. ARI of Connecticut, Inc., No. FST-CV-21-6054074-S, 2024 WL 3949049, at *2 (Conn. Super. Ct. Aug. 21, 2024); Grebla v. Danbury Hosp., No. 3:22-CV-13 (KAD), 2023 WL 4279097, at *3 n. 6 (D. Conn. June 29, 2023)(The "executive orders applied only to the suspension of limitations with respect to court proceedings and processes and did not suspend [Grebla's] obligations to timely file a charge of discrimination with the CHRO or the EEOC.").

Lewis has the burden of establishing that an extraordinary circumstance existed. He has not produced any evidence that the CHRO was closed for business due to the pandemic, but the, Court need not resolve whether Lewis has established extraordinary circumstances because Lewis has failed to establish that he acted as diligently as reasonably could have been expected under the circumstances. *See* Collazo v. Sikorsky Aircraft Corp., 3:03-cv-1620 (MRK), 2004 WL 1498130, at *3 (D. Conn. June 23, 2004)(a court need not determine whether extraordinary circumstances exist if the plaintiff has failed to act with reasonable diligence.)

### b. *Diligent Pursuit of Rights*

As noted earlier, when a party seeks equitable tolling, the court must examine the party's "diligence not only during the time that the party seeks to have equitably tolled but also during the time up to and including the date of filing." Adkins v. Warden, 585 F. Supp. 2d 286, 300 (D. Conn. 2008).

In <u>Fraser v. Howard</u>, No. 21-CV-9904 (JMF), 2022 WL 17718410 (S.D.N.Y. Dec. 15, 2022), the court rejected a request for equitable tolling based on the party's lack of diligence. Fraser failed to file a timely habeas petition. However, he argued that, due to misinformation from the court during the height of the pandemic, the lawyer who had represented Fraser did not learn of the decision that triggered the one-year deadline for filing a habeas petition until eight months after the decision was issued. <u>Id</u>. at *1. After noting that Fraser was required to establish that he had been pursuing his rights diligently, the court found that

> even assuming for the sake of argument that Fraser has shown that some extraordinary circumstance stood in his way, he cannot show the requisite "causal relationship" between that extraordinary circumstance and his failure to file by the September 17, 2021 deadline. Fraser indisputably was informed of the Appellate Division's decision denying him leave to appeal the denial of his post-conviction motion no later than May 17, 2021, when his lawyer in those proceedings emailed him the decision. At that point, Fraser still had 122 days before the September 17, 2021 deadline to file his petition. That was ample time for Fraser, had he acted with "reasonable diligence," to prepare and file the Petition that he filed in November.

<u>Id</u>, at *2.

Here, even if the Court accepts Lewis' argument that extraordinary circumstances existed through December 10, 2020, Lewis cannot establish that he acted as diligently as reasonably could have been expected. When the lawyer who had been representing Lewis in his worker's compensation case told Lewis, on December 10, 2020, that he needed to file a CHRO complaint, Lewis still had 115 days left to file his administrative complaint.

Lewis asserts that in early January of 2021, he made several calls to the CHRO, but after no one answered his calls, he visited the CHRO on January 4, 2021. Lewis does not identify the specific dates on which he tried calling the CHRO in early January of 2021. However, as discussed during oral argument, January 1, 2021, was New Year's Day, a state holiday; January

30

2, 2021, was a Saturday; and January 3, 2021, was a Sunday.[13]  The court takes judicial notice that the CHRO, as a state agency, is closed on state holidays and weekends. Thus, between December 10, 2020, and January 20, 2021, it appears that Lewis only attempted to contact the CHRO on one day when the CHRO normally would have been open for business (Monday, January 4, 2021). There is no evidence (or assertion) in the record that Lewis made any other attempt to contact the CHRO between January 4, 2021, and his filing deadline of April 4, 2021.

On January 20, 2021, Lewis retained the lawyer who had been representing him in his workers' compensation case since October of 2020 and asked the lawyer to help file a CHRO complaint. (Dkt. #69, at 30.) As of that date, Lewis still had 74 days left to file his administrative complaint. There is no evidence in the record as to what steps, if any, Lewis or his attorney took to try to contact the CHRO or file an administrative complaint during that 74-day period. As Defendants' Reply Brief notes, the CHRO's website contains an online complaint form, as well as contact information for the CHRO.[14]  (Dkt. #97, at 1.)  The contact information section includes the Hartford CHRO's mailing address, phone number, Fax number, e-mail address, and the e-mail address for the Regional Manager of the Hartford CHRO. There is no evidence in the record, and no assertion has been made that, at any time between January 20, 2021, and April 4, 2021, Lewis or his attorney tried to call the Hartford CHRO, or tried checking the CHRO's website for guidance, or tried e-mailing the Hartford CHRO or its Regional Manager to seek

[13] The court takes judicial notice that (1) Friday, January 1, 2021, was a state holiday (New Year's Day), (2) January 2, 2021, was a Saturday, and (3) January 3, 2021, was a Sunday.  *See e.g.* Allen v. Kunkel, 3:18-cv-297 (JCH), 2018 WL 3553335 (D. Conn. July 23, 2018).

[14] *See* https://portal.ct.gov/chro/commission/commission/contact-us and https://portal.ct.gov/chro/commission/publications/chro-forms.

guidance, or tried to initiate the filing process using the form on the CHRO website, or tried mailing or faxing a complaint to the CHRO.

Lewis is not required to demonstrate maximum feasible diligence to establish that he diligently pursued his rights, but he must show that he acted as diligently as reasonably could have been expected under the circumstances. By failing to take any action between January 20, 2021, and April 4, 2021, Lewis has failed to create a factual dispute that he acted as diligently as reasonably could have been expected under the circumstances. See Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000)("If the person seeking equitable tolling has not exercised reasonable diligence in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances therefore did not prevent timely filing."). Lewis never explains what, if anything, prevented him from filing an administrative complaint between January 20, 2021, and April 4, 2021.[15]

Given the findings above, the Court finds that Counts One and Two of the Amended Complaint are untimely. Therefore, Counts One and Two of the Amended Complaint are dismissed with prejudice.

> ### 3.   Lewis has not shown that a reasonable accommodation was possible between March of 2020 and June 8, 2020.

Had the Court found that Lewis' EEOC complaint was filed in a timely manner, Lewis would have faced another obstacle. It is undisputed that in March of 2020, when Lewis requested

---

[15] There is also no evidence in the record as to what steps, if any, Lewis or his attorney took between the filing deadline of April 4, 2021, and April 28, 2021 (the date Lewis filed the CHRO complaint.) *See* Adkins v. Warden, 585 F. Supp. 2d 286, 300 (D. Conn. 2008)(Courts examine a party's "diligence not only during the time he seeks to have equitably tolled but also during the time up to and including the date of filing.")

to be transferred out of the SID to the Backgrounds Unit or Forfeiture Unit, there were no vacancies for the position of detective in the Backgrounds Unit, C4 Intelligence Unit, or Pistol Permits. (Dkt. #88, at 77). Additionally, it is undisputed that no such vacancies existed between June 4, 2020, and July, 28, 2020, (dkt. 88, at ¶¶91-92), which covers the period immediately before Lewis was transferred to the CSD until his last day of work. Lewis denies these facts in his response to Defendants' Rule 56(a) Statement, but his denials are based on a former HPD police officer's assertion that police chiefs "have used significant discretion to create positions for officers who are struggling with mental health conditions or other difficulties." [16] (Dkt. 69-13, at ¶11.) However, as Defendants correctly assert (dkt. #58-1, at 37-38 and dkt. #78, at 23-24), neither the ADA nor the CFEPA required Chief Thody to accommodate Lewis by creating a new position or vacancy. *See* U.S. Airways v. Barnett, 535 U.S. 391, 410 (2002); Martinsky v. City of Bridgeport, 814 F. Supp. 2d 130, 148 (D. Conn. 2011), aff'd, 504 F. App'x 43 (2d Cir. 2012) ("[A]lthough a reasonable accommodation may include reassignment of an employee to a vacant position for which he or she is qualified, the ADA does not require an employer to create a new position in order to provide an accommodation."). Thus, Chief Thody's failure to create an administrative position or vacancy for Lewis would not have violated the ADA or the CFEPA.

Aside from arguing that Chief Thody could have created a position or vacancy for him, Lewis never identifies a specific suitable vacancy that existed during the relevant period. *See* Irizarry v. HNS Management Co., Inc., 19-cv-922 (VLB), 2021 WL 1178298 (D. Conn. March

---

[16] Assistant Chief Medina testified that he told Chief Thody that he and Captain Rousseau would figure out a way to move Lewis to C4 Intelligence. (Dkt. #69-12, at 10.) Assistant Chief Medina testified that he spoke to Captain Rosseau "about creating a vacancy in HPD C4 Department, Asset Forfeiture," and that "an accommodation would be made for Mr. Lewis to work in Asset Forfeiture, pending Chief Thody's approval." (Dkt. #69, at 12-13.). Lewis has not produced any evidence that a vacancy in C4 intelligence existed at the time or was approved by Chief Thody and came into existence. Lewis has offered no admissible evidence to refute Defendants' assertion that no such vacancy existed.

29, 2021)(granting summary judgment where there was no genuine dispute of fact that there were no suitable vacant positions after plaintiff made his request for a transfer).[17]  Therefore, even if Counts One and Two had been timely, summary judgment would have been appropriate.

### D.    Lewis' Claim for Constructive Discharge

#### 1.    The Constructive Discharge Claim is Timely.

In Count Four, Lewis alleges that he was constructively discharged because of his disability. Lewis filed his complaints with the CHRO and EEOC in April of 2021. (Dkt. #69, at 4). On October 13, 2021, while the CHRO and EEOC complaints were still pending, Lewis submitted his letter of resignation to the HPD. (Dkt. #88, at ¶122). However, Lewis did not file a new or amended complaint with the CHRO or EEOC to add a claim of constructive discharge.

The CHRO sent Lewis a release of jurisdiction letter on February 3, 2022. (Dkt. #69, at 4). Thereafter, Lewis filed his federal complaint on April 6, 2022. (Id., at 5). The federal complaint did not include a claim for constructive discharge. (Id.). On November 23, 2022, Lewis amended his federal complaint to add a claim for constructive discharge. (Id.). The Defendants argue that the constructive discharge claim was untimely. However, the Court finds that the constructive discharge claim is reasonably related to the conduct that was alleged in Lewis' CHRO and EEOC complaints.

---

[17] Lewis argues that the Defendants failed to engage in an interactive dialogue. (Dkt. #69, at 51-61.) However, as he acknowledges in his brief, "the failure to engage in the interactive process does not itself give rise to liability under the ADA unless the employee shows that accommodation was possible."  (Id., at 52).  As the Second Circuit has held, an employer's failure to engage in the interactive process, "does not relieve a plaintiff of [his] burden of demonstrating, following discovery, that some accommodation of [his] disability was possible." McBride v. BIC Consumer Prod. Mfg. Co., 583 F.3d 92, 101 (2d Cir. 2009). As Defendants note, Lewis has not identified any suitable vacant positions that were available and for which he was qualified between March of 2020, and July 28, 2020. (Dkt. #78, at 22.) Instead, Lewis argues that the HPD has been chronically understaffed in numerous departments and could have created a position or vacancy that did not investigate violent crimes. (Dkt. #69, at 60.)

The Second Circuit has held that subsequent conduct is reasonably related to the conduct in an EEOC charge if the subsequent claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination. Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002). Lewis' claim of constructive discharge asserts that "[w]hen it was apparent that the City of Hartford had no intention of adequately rectifying the discrimination through engaging in an interactive process to accommodate his disability, Mr. Lewis was forced to resign." (Dkt. #68, at 68.)  Lewis argues that the City of Hartford "deliberately created an inhospitable working condition through failing to engage in the interactive process after Mr. Lewis' July 28, 2020, hospitalization for the purpose of Mr. Lewis not returning to work." (Id.). To the extent that Lewis' CHRO and EEOC complaints alleged that the Defendants failed to accommodate his disability, the Court finds that his claim of constructive discharge, by its nature, would have fallen within the reasonably expected scope of the EEOC investigation. As a result, the Court finds that the constructive discharge claim is reasonably related to the claims asserted in the CHRO and EEOC complaints.

The Defendants argue that the last alleged failure to accommodate Lewis' disability occurred on June 8, 2020, and therefore, Lewis needed to file his constructive discharge claim within 300 days of that date (i.e., the last discriminatory act), even though Lewis had not yet resigned. (Dkt. #78, at 26.). However, this argument is inconsistent with the U.S. Supreme Court's decision in Green v. Brennan, 578 U.S. 547, 564 (2016).  In Green, the Court held that a constructive discharge claim "accrues only after an employee resigns." Id., at 554. The Court stated that an employee who alleges that he has been constructively discharged

> must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. But he must also show that he actually resigned.  In other words, an employee cannot

> bring a constructive-discharge claim until he is constructively discharged. Only after both elements are satisfied can he file suit to obtain relief.

Id., at 555. The Court made clear that a constructive discharge claim accrues "only after a plaintiff resigns." Id. "[O]nly at that point – and not before – does he have a 'complete and present' cause of action." Id.  As of June 8, 2020, Lewis did not have a claim of constructive discharge. The constructive discharge claim only accrued after Lewis resigned on October 13, 2021.  Therefore, the Court finds that Lewis' constructive discharge claim is timely.

        2.        <u>There is a material issue of fact regarding the constructive discharge claim</u>

As a preliminary matter, the Court notes that while the Defendants have argued that they were unaware of Lewis' alleged disability when they transferred him to the CSD on June 8, 2020, there can be no doubt that they were aware of Lewis' disability prior to his resignation. Lewis submitted his resignation on October 13, 2021. (Dkt. #88, at ¶123). By that date, Dr. Grant-Hall had sent a letter to Defendant's worker's compensation carrier notifying the carrier of Lewis' PTSD diagnosis, (dkt. #69-18), and Lewis had filed complaints with the CHRO and EEOC alleging that the Defendants had failed to accommodate his disability, (dkt. #69-3).

A constructive discharge "occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." <u>Whidbee v. Garzarelli Food Specialties, Inc</u>., 223 F.3d 62, 73 (2d Cir.2000). An employee "may prove a constructive discharge by establishing that his "employer, rather than acting directly, deliberately ma [de his] working conditions so intolerable that [he was] forced into an involuntary resignation," *i.e.,* 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" <u>Kirsch v. Fleet St., Ltd.</u>, 148 F.3d 149, 161 (2d Cir. 1998)(quoting <u>Pena v. Brattleboro Retreat</u>, 702 F.2d 322, 325 (2d Cir. 1983)). Thus, "[t]o succeed on a constructive discharge claim, an employee must 'show both (1) that

there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign, and (2) that ... a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign.'" <u>Makinen v. City of New York</u>, 722 F. App'x 50, 52 (2d Cir. 2018)(quoting <u>Shultz v. Congregation Shearith Israel of N.Y.</u>, 867 F.3d 298, 308 (2d Cir. 2017)).

Lewis' constructive discharge theory is based, in large part, on the Defendants' alleged failure to engage in an interactive dialogue after he was hospitalized on July 28, 2020. Lewis asserts that "[w]hen it was apparent that the City of Hartford had no intention of adequately rectifying the discrimination through engaging in an interactive process to accommodate his disability, Mr. Lewis was forced to resign." (Dkt. #69, at 68.) Lewis argues that the evidence shows that "the Defendant City deliberately created an inhospitable working condition through failing to engage in the interactive process after Mr. Lewis's July 28, 2020, hospitalization for the purpose of Mr. Lewis not returning to work." (<u>Id.</u>) In this respect, Lewis notes that "[p]rior to being reassigned to CSD, Mr. Lewis had several conversations with Asst. Chief Medina, who assured him that he would try to assist him and provide a background position away from the investigation of violent crimes."[18] (<u>Id.</u>, at 70.) "However, when the option was presented to Chief Thody, he refused to approve Mr. Lewis's request and instead assigned him to directly investigate violent crimes in CSD. As a result, Mr. Lewis reasonably felt that he had no further avenues to pursue to change his situation that he had not already exhausted." (<u>Id.</u>)

The Defendants assert that the relevant period to be considered when determining if Lewis has established that intolerable work conditions existed for his constructive discharge

---

[18] The Court acknowledges that it has held that Lewis' failure to accommodate claim was untimely, but the Supreme Court's holding in <u>Green v. Brennan</u>, *supra*, seems to suggest that the alleged conduct can still be considered when evaluating Lewis' constructive discharge claim.

claim is between March 6, 2020, and July 28, 2020, because Lewis never returned to work after July 28, 2020. (Dkt. #58-1, at 49). To the extent that Lewis' constructive discharge claim is based on an alleged failure to accommodate his disability, the Defendants cite Hurley-Bardige v. Brown, 900 F. Supp. 567, 573-74 (D. Mass. 1995), and argue that "even under the most lenient standard, more than a mere failure to make reasonable accommodation is necessary to prove constructive discharge." (Dkt. #58-1, at 50.)

In Hurley-Bardige, the plaintiff, who was a nurse practitioner, had a chronic affliction of the inner ear that affected her balance and hearing. Hurley-Bardige, 900 F. Supp. at 569.  The condition eventually rendered her unable to hear heart and lung sounds. Id.  She notified her supervisors of the situation and requested a temporary transfer to an administrative or non-patient unit. Id.  Her request was denied, but the defendant provided her with a telephone that was designed for the hearing impaired and ordered a stethoscope for the hearing impaired. Id. The court found that the defendant's failure to transfer plaintiff as an accommodation "cannot be said to have created an environment so hostile that a reasonable person in her position would have felt compelled to resign.  Id., at 574.  The court added that

> In addition to the failure to transfer, however, [plaintiff] proffers evidence that her supervisors and coworkers demeaned her and told her that she was incompetent as a result of her disability. Moreover, she says that the telephone that was provided for her was defective and the stethoscope that was ordered for her arrived months after she requested it. Given the totality of the circumstances, a trier of fact may reasonably conclude that [plaintiff] was subjected to a working environment so hostile that a reasonable person in her position would have resigned.

Id.

In denying summary judgment on the constructive discharge claim, the court in Hurley-Bardige considered the totality of circumstances, which included the defendant's failure to accommodate plaintiff.  *See also* Johnson v. Shalala, 991 F.2d 126, 132 (4th Cir. 1993)("a

38

complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge"), *cert. denied*, 513 U.S. 806 (1994).[19]

Here, Lewis argues that he was constructively discharged because the Defendants failed to engage in an interactive dialogue after he was hospitalized. Lewis' exhibits include a detailed letter from Dr. Grant-Hall, dated December 15, 2020, which states that Lewis has PTSD, discusses his symptoms, and tells the recipient to call Dr. Grant-Hall with any questions or concerns. (Dkt. #69-6.) The parties have not told the Court what, if anything, Hartford did in response to Dr. Grant-Hall's letter or what, if anything, Hartford did in response to the statement in Lewis' CHRO complaint that Lewis, who was a current employee of the HPD at the time, had PTSD. However, it is undisputed that the parties did not engage in an interactive dialogue after Lewis was hospitalized and after Lewis subsequently notified Hartford that he had PTSD.[20] Unlike the period between March of 2020, and July 28, 2020, there is evidence in the record that suggests that, after July 28, 2020, two detective vacancies became available for which Lewis was qualified.

Although the briefs do not devote much attention to it, Defendant's Rule 56(a) statement admits that there were two postings for the position of detective—one on January 18, 2021, and

---

[19] In Theilig v. United Techs. Corp., No. 3:07-CV-1530(EBB), 2009 WL 10676574, at *5 (D. Conn. Dec. 10, 2009), adhered to on reconsideration sub nom. Theilig v. United Techs. Corp. Pratt & Whitney Div., No. 3:07-CV-1530(EBB), 2010 WL 11530457 (D. Conn. Mar. 25, 2010), and aff'd sub nom. Theilig v. United Tech Corp., 415 F. App'x 331 (2d Cir. 2011), the Honorable Ellen Bree Burns acknowledged but distinguished the Fourth Circuit's decision in Shalala.

[20] Although Lewis filed a worker's compensation case in July of 2020, which stated that he was out of work due to a rapid heart rate, Lewis' attorney notified Hartford's worker's compensation carrier that Lewis was claiming PTSD in October of 2020. (Dkt. #88, at ¶110.) Lewis also filed a CHRO complaint in April of 2021, which stated that he has PTSD. (Id., at ¶120.)

the other on May 7, 2021. (Dkt. #88, at ¶59). Both positions were posted before Lewis submitted

his resignation letter in October of 2021. Neither the Rule 56(a) Statement nor the briefs mention

which divisions or units the two detective positions would have been assigned to or whether the

positions would have permitted Lewis to avoid investigating violent crimes. Instead, Defendants

note that Lewis did not apply for either detective position or request to be reassigned to those

positions. (Id., at ¶60). Construing all inferences and doubts in favor of Lewis, this would seem

to suggest that Lewis was potentially qualified for the two detective positions.

Although Lewis admits that he did not apply for the two detective positions (id.), Lewis

argues that given his medical condition, the Defendants should have assumed the burden of

reaching out to him "to gauge the extent of his disability and to communicate regarding what

reasonable accommodations they could make so that Mr. Lewis could return to work." (Id.)

Construing all facts and inferences in favor of Lewis, this also seems to suggest that Lewis was

qualified for the detective positions. Thus, the record arguably contains evidence of repeated

failures to engage in an interactive dialogue that could have allowed Lewis to return to work.

There are too many gaps in the record for the Court to conclude that there is no genuine issue of

material fact on Lewis' constructive discharge claim.

### D.  Lewis' Claim for Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress, Lewis must establish

four elements: (1) Chief Thody intended to inflict emotional distress or knew or should have

known that emotional distress was the likely result of his conduct; (2) the conduct was extreme

and outrageous; (3) Chief Thody's conduct was the cause of Lewis' distress; and (4) the

emotional distress sustained by Lewis was severe. Appleton v. Bd. of Educ. of Town of

Stonington, 757 A.2d 1059, 1062 (Conn. 2000). "Whether a defendant's conduct is sufficient to

satisfy the requirement that it be extreme and outrageous is initially a question for the court to

determine." Id, at 1062.

"[T]he bar for conduct that is found to be 'extreme and outrageous' is set very high."

Holmes v. Town of East Lyme, 866 F.Supp.2d 108, 135 (D. Conn. 2012).

> Liability has been found only where the conduct has been so outrageous in
> character, and so extreme in degree, as to go beyond all possible bounds of decency,
> and to be regarded as atrocious, and utterly intolerable in a civilized community.
> Generally, the case is one in which the recitation of the facts to an average member
> of the community would arouse his resentment against the actor, and lead him to
> exclaim, Outrageous!

Tracy v. New Milford Pub. Sch., 922 A.2d 280, 287 (Conn. App. 2007). "In the employment

context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or

outrageous." Miner v. Town of Cheshire, 126 F. Supp.2d 184, 195 (D. Conn. 2000). Thus,

routine employment action, even if taken with improper motivations, does not constitute extreme

or outrageous behavior when the employer does not conduct the action in an egregious and

oppressive manner. Id.

In Perez-Dickson v. City of Bridgeport, 304 Conn. 483 (2012), after a jury returned a

verdict in favor of plaintiff on her claim for intentional infliction of emotional distress, the

Connecticut Supreme Court held that no reasonable juror could have found that the conduct met

the "high threshold" required for extreme and outrageous conduct. Id., at 527. In reaching this

conclusion, the Court found that there was

> no evidence that [defendants] subjected the plaintiff to any unduly humiliating,
> embarrassing or denigrating language or conduct, intentionally or otherwise.
> Rather, they subjected her to actions that individuals in the workplace reasonably
> should expect. See *Perodeau v. Hartford,* 259 Conn. 729, 757, 792 A.2d 752
> (2002)("individuals [in the workplace] reasonably should expect to be subject to ...
> performance evaluations, both formal and informal; [and] decisions related to such
> evaluations, such as those involving transfer, demotion, promotion and
> compensation" and "reasonably should expect to experience some level of
> emotional distress, even significant emotional distress, as a result"). Moreover,

41

even if we were to assume that the defendants were wrongfully motivated in subjecting the plaintiff to this conduct, wrongful motivation by itself does not meet the standard for intentional infliction of severe emotional distress; rather, "it is the act itself which must be outrageous." (Internal quotation marks omitted*.) Aquavia v. Goggin,* 208 F.Supp.2d 225, 237 (D. Conn. 2002). . . .

Id., at 528-29.

Lewis' claim for intentional infliction of emotional distress is based on Chief Thody's alleged violations of the ADA and CFEPA.  However, "Connecticut precedent establishes that discriminatory employment actions, although unlawful on other grounds, do not rise to the level of conduct that is 'beyond all possible bounds of decency.'" Ferrante v. Capitol Regional Educ. Council, 3:14-cv-0392 (VLB), 2015 WL 1445206, at * 9 (D. Conn. March 30, 2015); *see also* Wynn v. New Haven Bd. of Educ., No. 3:21-CV-925 (SVN), 2022 WL 1063732, at *8 (D. Conn. Apr. 8, 2022)(conduct insufficient where plaintiff alleged that defendant refused to promote him because of race and then terminated him because of his disability.); Richter v. Conn. Jud. Branch, No. 3:12CV1638 JBA, 2014 WL 1281444, at *11 (D. Conn. Mar. 27, 2014), aff'd, 600 F. App'x 804 (2d Cir. 2015)("Plaintiff has not alleged any conduct beyond an ADA violation, which without more does not constitute 'extreme and outrageous' behavior."); Allen v. Egan, 303 F. Supp. 2d 71, 78 (D. Conn. 2004)("Although employment discrimination is illegal, it does not *per se* give rise to a claim for intentional infliction of emotional distress."); Armstead v. Stop & Shop Cos., Inc., No. 3:01 CV 1489 JBA, 2003 WL 1343245 (D. Conn. Mar. 17, 2003)(firing plaintiff because of his physical condition; refusing to reasonably accommodate his lifting and bending restrictions; and refusing to schedule him for work or to communicate with him about his employment status did not meet the standard for an intentional infliction claim.).

Lewis alleges that Chief Thody was aware of his disability (PTSD) but denied his request for accommodation by refusing to transfer him to the Backgrounds Division or the C4

42

Intelligence Unit.[21] Instead, Chief Thody transferred Lewis to a division that required him to investigate violent crimes. Although Assistant Chief Medina recommended that Chief Thody transfer Lewis to one of the units Lewis had requested, Chief Thody refused to do so, and commented that "the tail doesn't wag the dog, the dog wags the tail." Given the Connecticut case law, Lewis cannot establish that Chief Thody's conduct exceeds all bounds tolerated by decent society. *See* Groth v. Grove Hill Med. Ctr., P.C., No. 3:14-CV-01563 (RNC), 2015 WL 4393020, at *6 (D. Conn. July 15, 2015) (plaintiff failed to show that the conduct was sufficiently extreme and outrageous where she alleged that defendant terminated her with a retaliatory motive, fabricated an explanation for the termination, and engaged in other retaliatory treatment before terminating her.); Tomby v. Community. Renewal Team, Inc., No. 3:09-CV-1596 CFD, 2010 WL 5174404 at *7 (D. Conn. Dec. 15, 2010) ("Although [Defendant] repeatedly forced [plaintiff] to exert himself beyond his medical limitations, such action, without more, is not extreme or outrageous."); Sousa v. Roque, No. 3-05CV822 (JCH), 2005 WL 3543721, at *4 (D. Conn. Dec. 16, 2005)(Defendant's "refusal to allow [plaintiff] to extend his medical leave and [defendants'] rejection of his request to work from home, as alleged, are also routine employment actions."); Reed v. Signode Identification Corp., 652 F. Supp. 129, 136–37 (D. Conn. 1986)(denying a request for a leave of absence from an employee who was undergoing treatment for cancer and then refusing to rehire him when his former position was available was not sufficiently extreme and outrageous); Tomick v. United Parcel Serv., Inc., No.

---

[21]To the extent that the claim for intentional infliction of emotional distress is based on the same facts as the failure to accommodate claim, it is undisputed that from the date that Lewis requested to be transferred to the Backgrounds Division or C4 Intelligence through July 28, 2020, there were no vacancies in the Backgrounds Division or C4 Intelligence, and no vacancies for detective positions. (Dkt. #88, at ¶58 and ¶92). Because Chief Thody's failure to create a position or vacancy for Lewis does not violate the ADA or the CFEPA, his failure to do so also would not be extreme and outrageous.

CV064008944, 2010 WL 2196576, at *4 (Conn. Super. Ct. Apr. 23, 2010), aff'd sub nom.

Tomick v. United Parcel Serv., Inc., 135 Conn. App. 589, 43 A.3d 722 (2012)(granting summary

judgment where defendant knew plaintiff had a 15% partial disability to his back, gave him too

much work for one person to do, and reneged on the promise to provide him with a helper.)

Therefore, Count Three of the Amended Complaint is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (ECF No. 23-1) is

GRANTED as to Counts ONE, TWO, and THREE, but DENIED as to Count FOUR.

This is not a recommended ruling. The consent of the parties allows this magistrate judge

to direct the entry of a judgment of the district court in accordance with the Federal Rules of

Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals

from this judgment.  See 28 U.S.C. § 636(c)(3).

SO ORDERED this 31st day of March, 2026 at Hartford, Connecticut.

_____/s/_____

Robert A. Richardson
United States Magistrate Judge

44